Case number 15-1335. Masters Pharmaceutical, Inc. Petitioner v. Drug Enforcement Administration. Mr. Dallara for the petitioner, Mr. Riley for the respondent. You don't need that. I hate to criticize you, but... You're bad, you're bad. I'm going to tell Pam. Tell Pam? I'm going to tell Pam. I'm going to tell Pam. Good morning. May it please the court, my name is Rick Lauer. I represent the petitioner, Masters Pharmaceutical. The DEA Administrator's final order in this matter violates the Administrative Procedures Act by imposing new substantive duties which are binding on all controlled substance distributors without first going through the formal notice and comment rulemaking procedure. It violates Masters' due process rights by adjudicating claims that were never asserted at the hearing. It arbitrarily rejects the ALJ's factual findings and credibility determinations while at the same time ignoring substantial undisputed evidence which was favorable to my client. And it violates Masters' contractual rights by imposing liability for conduct for which Masters had obtained a complete release of claims. Any one of these violations would be sufficient grounds for this court to reject the final order. Taken together, they present a compelling case in petitioner's favor. With respect to the first issue, the violation of the Administrative Procedures Act, there really can be no dispute as both the petitioner and the amici in this case have established in the briefs that the final order imposes new substantive, legally binding duties on all controlled substance distributors. Section 553 of the APA requires that agencies provide notice and permit interested parties to comment before imposing such duties. Here, the final order imposes numerous duties, including the duty to conduct due diligence on all customers, the duty to not ship orders deemed to be suspicious, the duty to identify and report orders placed by customers that exhibit so-called red flags of diversion, the duty to obtain utilization reports from pharmacy customers and identify allegedly suspicious dispensing patterns, the duty to investigate physicians that have prescriptions filled at pharmacy customers, the duty to perform and document results of site visits and verify information gathered during those visits, the duty to document due diligence activities, the duty to investigate the nature of a customer's business, and the duty to determine if a customer is filling legitimate prescriptions. All of those duties, all of which are substantive, and none of which are required by either the Controlled Substances Act or the regulation. Do you agree that there was a duty in place already to disclose suspicious orders? There is a duty to identify and report suspicious orders, yes, Your Honor. Right. And so a lot of the things that you ticked off sound like they're just commensurate with the duty to identify and report suspicious orders. There's just things that you would normally do to identify and report suspicious orders. Due diligence, you have to do some diligence to find out if an order is suspicious. Well, Your Honor, the regulation identifies suspicious orders as those being of an unusual size, pattern, or frequency. It refers specifically to the characteristics of the order itself. It does not refer to characteristics of the pharmacy placing the order. And if you look at the final order, what the administrator does is he crafts an entirely new definition of suspicious orders, which has to do with the pharmacy placing the order. And it is simply not a reasonable... I guess I'm not entirely following what you're saying because the size of the order has to be by reference to something, so it has to be by reference to some pharmacy. I take it. The size of the order could certainly be with reference to orders placed with that distributor by other pharmacies. It does not necessarily have to be in reference to the size of the pharmacy itself placing the order. But it could be both. Yeah, no, I'm sorry. I wasn't talking about the size of the pharmacy. I was just talking about the size of the order placed by a pharmacy. So you're necessarily comparing an order by pharmacy X against the subsequent order by pharmacy X in order to determine whether it's a strange-sized order. I would agree with that, Your Honor. So that's bound up in the background duty that you agree exists, which is the duty to make sure orders aren't suspicious. There's a duty to look at the orders that the distributor receives and determine which are unusually large and therefore suspicious. That's correct. Yeah, and what's the extra is? Well, Your Honor, there are numerous things. First and foremost is the alleged duty to determine whether the dispensing practices of the pharmacy are suspicious. And this appears throughout not only the final order but the briefs from the government in this case, that a distributor has a duty to evaluate the way in which a pharmacy is dispensing. And that is an entirely different issue than the orders that a pharmacy is placing with a distributor, especially a distributor like my client, which is a secondary wholesaler, which is not providing a regular and continuous supply of the same products to these pharmacies. And there's a wealth of evidence about that in the record, about the tertiary nature of a secondary wholesaler's business and how supply and demand that my client sees is affected by things like price and availability of the products in the market and a whole host of other things. So to your point, I mean, the final order is replete with alleged duties that go well beyond just comparing one order to the next or one order to other orders received by that wholesaler. But the regulation on that, I think you're talking about .74B? Yes, Your Honor. Suspicious orders include orders of unusual size or deviating substantially from the normal pattern. And so I think the challenge for you is, A, the question that Judge Tremendousen asked, which was aren't these sort of subsidiary activities to discovering whether an order is of unusual size or deviates substantially? But also, the second challenge for you is that the regulation is not written as if those are the only indicia of suspiciousness. I would say a couple things in response to that. The first is that under Section 1301.71A, the regulation makes clear that the only factors the administrator can examine when determining whether a wholesaler has maintained effective controls against diversion are those set forth in 1301.72-76, which does include the duty to identify and report suspicious orders. But there is not a catch-all provision within that that would allow the examination of other factors, as there is, for example, in 1301.34C, which applies to other cases. But that's not entirely responsive to the notion that .74B itself is more capacious than the way you're reading it. And, Your Honor, the way the final order, it takes that position that there are other factors about an order which may make it suspicious, not just its size, pattern, or frequency. And our position is that it's a completely unreasonable interpretation or review of that statute. And the reason is just there are many examples of this. For one reason, under the – and, again, we don't believe this is really an interpretation of the statute. We believe it's a new substantive rule that requires notice in court. I understand. But if you want to claim it's an interpretation, it's completely unreasonable because a suspicious order is an order that needs to be identified and reported. Under this alleged interpretation, a distributor has a duty to investigate every client, every customer, regardless of the size, pattern, or frequency of the order. Because under the final order, there's a duty to report something if a distributor determines that there are suspicious circumstances surrounding the pharmacy. And there are many cases, Your Honor, where a distributor would learn information that might cause it to be suspicious about a pharmacy customer that have no relation to the order itself. But yet, under the final order, we would have a duty to report something. And this is something that the government has struggled with throughout this case. If you look at the record that took place in the hearing, the government's original theory about this duty was that once my client had determined that there was something suspicious about the pharmacy, it had a duty to go back in some undefined period of time to orders that had already been shipped and placed and report those orders as suspicious. That theory was rejected by the ALJ and rejected by the administrator. And the administrator never identifies, never clarifies this obvious misinterpretation by identifying what a distributor is required to do when it learns suspicious information, but there's no order that's the cause of that. And what I think that tells the court is that that's not what this regulation was intended to require. The other thing you can look at, Your Honor. So the position that you're taking is the order should be the cause of the suspicion and then everything else, then the due diligence kicks in. Our position is that the only duty is to identify orders of unusual size, pattern, or frequency. And that is something that the distributor can do within the four walls of its building. It can look at those orders and say this one is suspicious, this one is not. And if it identifies those orders as suspicious, it must be reported. And the other reason I think you can see that our interpretation of this is correct is because the regulation does require the distributor to do one thing with respect to its customers. It requires the distributor to make a good faith effort to determine whether the customer has the appropriate state and federal licensure. It is not reasonable to believe that a regulation that requires only a good faith effort to document proper licensure also requires extensive due diligence of the pharmacy, including but not limited to figuring out what its business model is, figuring out what its dispensing practices are, figuring out who it's filling prescriptions for and whether those doctors are operating legitimately, and on and on and on. If your client looks at an order and says that order seems out of whack in terms of numbers with prior orders, so it's an order potentially of unusual size, and then your client decides nonetheless not to report the order. Say you don't report the order because you just fill an order that's of a lower quantity or you just delete the order and don't respond to it at all. If that doesn't, would the reporting obligation apply with respect to that order? I'd say two things. I believe it would, and I would say that that is not what occurred in this case, and there's no evidence of that in this case. If a registrant determines that an order is suspicious due to its unusual size, pattern, or frequency, it has a duty to report that order to the DEA. Now, they have claimed that a registrant has another duty, which is to not ship that order. And if you look at the 2006-2007 guidance letters, it's really what they're talking about. They're talking about the decision that a registrant has to make when it identifies suspicious order. There's no question it has to be reported to the DEA. The next question the registrant has to answer is, can I ship the order anyway? And all that a registrant has to do in that case to comply with this guidance is not ship the order. The order, the administrator's order here talked about failure of reporting, right? It wasn't the – they identified situations in which your client got an order and then you responded by deleting the order, not filling it at all, or filling some lower amount. And that seems like a situation in which the order was suspicious and therefore should have been reported, but it was not. Did that not happen? It did not happen, Your Honor. It never happened. It's absolutely a misinterpretation of the record that occurs for the first time in the final order. Did the administrator at least find that that happened? The administrator found that by starting with an obvious misinterpretation of the policies and procedures in place at my client, the administrator held that any order that was held by our SOM system, our Suspicious Order Monitoring System, which is an electronic system, any order that was held by that system and then not fully investigated was ipso facto a suspicious order and had to be reported. That is not the way the policy and procedure reads and certainly not the way the statute reads or the regulation reads. And, Your Honor, that is not a claim that was ever made at the hearing. This analysis that the administrator goes through in the final order occurred for the first and only time in the final order. That was not the claim that was made at the hearing. So that's really a due process violation that we talk about in our briefing, and it's substantial. We've never had the opportunity to explain, for example, why certain orders were edited or deleted.  And the only evidence in the record was the orders were edited and deleted for reasons having nothing to do with compliance and that there was never a case where a suspicious order was edited or deleted for the purpose of avoiding the reporting requirement. Quite to the contrary. Whether or not it's for the purpose of avoiding the reporting requirement, isn't there a problem if it does fail to meet the reporting requirement? Well, Your Honor, I think in a hypothetical situation where a distributor was deleting orders rather than reporting, where the distributor had determined an order to be suspicious, in fact, and instead of reporting it, deleted the order, I do agree that would be a problem. But, again, that is not what happened in this case. The only way that the administrator reaches this conclusion that we're discussing is by misinterpreting what the SOM system is designed to do. The SOM system holds any order that varies in any respect from the patterns that are set forth by the prior orders, as little as one pill. The SOM system was also used to make sure that the compliance department could keep a closer eye on customers and see what they were ordering. So, in those cases, orders that were held were objectively not suspicious. Or they were not shown to be in violation, but isn't the purpose of the SOM system to alert so that follow-up can be made? The purpose of the SOM system was to allow the people in the compliance department to look at the order, look at the customer, to take the knowledge they had of that customer and its business model, its practices, et cetera, and determine whether the order was in fact suspicious. And if they find one way or the other, there's no duty to keep any kind of record on that? Your Honor, if they find that the order is suspicious, there's a duty to report it. And that was done. But if they find not, there's no duty to keep a record on that? There is no duty in the statute of the regulation that requires any specific record keeping. Now, our compliance files were voluminous, and there was a lot of information in those files. And much of what occurred in the final order is simply misinterpretations of computerized notes and other things that, again, were never presented at the hearing, so we never had a chance to respond to. In the very few cases during the hearing where the diversion investigator attempted to interpret notes from the file and things of that nature, it was shown that he was misinterpreting them. So the purpose, the evidence in the case, was that every order that the compliance department determined to be suspicious was reported to the DEA, was not shipped, and no further controlled substance business was done with that customer. That is undisputed. I think it's nonresponsive to one of what I understand to be the administrator's concerns, which was before a yea or nay decision is made by the compliance office for what Masters contends were independent business reasons, the order was changed and deleted. I don't believe that's the fact, Your Honor. When orders were changed or deleted, that was done by the compliance department. But before they made any suspiciousness, followed up on any suspiciousness question. So there's a kind of end run around a duty to investigate, or end run about just to put it in a non-legally conclusory way. In that situation, the investigation, because the deletion might happen before the investigation, no investigation would take place. Well, Your Honor, I would just, I think that's their argument, and I think it frankly doesn't comport with the facts, but nonetheless I would just say there is no duty to go out and examine the dispensing practices of the pharmacy, and regardless of what our policies and procedures may say, there is no legal duty to obtain a utilization report every time an order is held, or to call the customer and find out why it was that they placed a particular order. That duty simply does not exist. So, Your Honor, I would just disagree. I disagree with the findings of a signed order. I guess the question is this, that duty may or may not exist, and let's just assume for purposes of argument that it doesn't exist, as you say. I thought a large part of what was going on in the administrator's order is that there was a failure of reporting. And so if there's a deviation in quantity, then a concern arises because there's been a deviation in quantity vis-a-vis the pattern of ordering from that pharmacy. And then it may be that that deviation is totally explainable. It may be that you do some work and you realize, you know, for your own purposes, you can fill the order. But that doesn't mean that there's not an obligation to report it anyway because there's been a deviation in the quantity. Now, if you don't do any diligence, then it just bolsters the notion that there should have been a reporting because then how can you know that there is an explanation for the deviation pattern? And that seemed like that was going on. And what was going on was that there would be a quantity bump, and for some reason that quantity bump was never reported. And then the arguments that were being made about how due diligence wasn't done were to show that you could have done due diligence to explain why that quantity bump was totally understandable. But that due diligence wasn't done, and so what you're left with is a quantity bump without an explanation and therefore a breach of the obligation to report it to the DEA. Well, I'd say two things about that. First of all, I'm not sure that's what the administrator actually did. What the administrator actually did in the final order was to say that any order that was held, and oftentimes that would be the result of a change in quantity, but any order that was held is automatically suspicious unless it's investigated. So it certainly could be the case that the customer ordered five bottles in January and six bottles in February, and that order would be held. Your question presupposes that an order like that, five in one month and six in the next, would have to be investigated before it could be shipped because that jump in quantity would make it suspicious. The evidence with respect to my client, however, Your Honor, is that there are wide fluctuations in the quantity of product that are ordered and that our customers do not order every month. We're a secondary wholesaler, and they respond in terms of price and market availability and all sorts of other factors. So there is extensive evidence in the record about that. So it is not simply the case to say that, well, any time there's a change in quantity from order one to order two, that that triggers some duty to either report the order or do due diligence. That just is not what the regulation means. I think you have to read the regulation in terms of, you know, what are its purposes. You know, you're trying to advise the DEA of potential unlawful activity, and the fact that somebody orders from us in January five bottles and orders in June six bottles is just simply not suspicious. But under this new substantive rule, among many others announced in this final order, there would be a full duty to investigate not just that, Your Honor, but every single order. I'm still not sure why you say it's a new substantive rule, given that the criteria are not all inclusive, that they're disjunctive, that there was the letter from the DEA in 2007 making that absolutely explicit. I mean, I thought that sort of bolstered your other argument, because the other regulation you're relying on doesn't have this including language. But here I haven't really heard you respond to that. Well, Your Honor, if I understand what you're saying, I mean, we believe that it's a substantive rule that is not encompassed with the language in the final order, is that this due diligence rule is encompassed within the text. And I simply disagree with that. The question I think that Judge Edwards posed in the case having to do with the flight attendants is, are the registrants free to ignore this rule? And the answer is clearly not. We're clearly not free to ignore it. And, in fact, the DEA has already asserted in another case that the rules coming from the final order in the Masters case are binding on them. So if it's a rule that has legal effect and is binding, it is a substantive rule. It amends a rule that was adopted through notice-and-comment rulemaking and, therefore, can only be promulgated through notice-and-comment. All right. Let me ask one more follow-up question, because I'm just trying to understand your position on that point. If your client had actual knowledge that a pharmacy is engaged in illegal practices, but it continues in lockstep to order small and regular amounts that do not change from order to order, no duty to investigate? Well, Your Honor, that is essentially what happened in the Southwood case. And the way that the DEA analyzed that case, and, again, it's certainly not the case here. In this case, there was no evidence whatsoever that any of these pharmacies were engaged in illegal activity. These were not Internet pharmacies that, by virtue of their very business model, were engaging in illegal activity, as was the case in Southwood. But taking the hypothetical that you gave, I think it could be argued that the general duty to maintain effective controls against diversion would prevent the shipment of an order to a customer that the distributor had actual knowledge was engaged in diversion, no matter what the size was. I'm not sure what you might report there, but if there's actual knowledge of criminality, certainly Southwood says there's a general duty to not provide more controlled substances to that pharmacy. But, again, that is not the case with this, in our case. And these pharmacies were brick-and-mortar pharmacies that were filling legitimate prescriptions. Thank you. Thank you. Thank you. Good morning, and may it please the Court. Nicholas Riley for the DEA. Just to begin, and it sounds like the panel's questions were going in this direction anyway, to be absolutely clear, the administrative decision in this case was based on MASTERS' repeated failure to report orders that were suspicious. I think it's telling that of all these extra what MASTERS and amici refer to as due diligence duties, the obtaining URs, looking at a pharmacy's dispensing practices, they haven't identified a single order that the DEA deemed, that the administrator deemed suspicious, based solely on MASTERS' failure to conduct those particular duties. In every instance, the baseline for deeming the order suspicious was the fact that the order deviated from the customer's ordinary size, pattern, or practice of ordering. As they describe it, basically every order deviates because nothing's regular. So every order they get in is being alerted under SOMS. Right. I mean, I think that mischaracterizes the administrator's analysis. As a practical matter, MASTERS' own SOMS system set monthly limits for these customers, and in many instances the customer's orders exceeded that limit by huge margins. I think it's useful just to look at. I mean, if you look at, we highlighted some of these examples in our brief, but I think Englewood provides a few clear-cut examples, particularly the orders that were placed in May of 2010. At that point, Englewood had a monthly limit of, I think, around 50,000. I forget the exact limit, but what we know is that they ordered, in the middle of the month, 70,000 dosage units of oxycodone-30. MASTERS' own compliance records indicate at that time, for that month, that the normal pattern and frequency for Englewood's orders was about 500 a month, 500 bottles, which would be about 50,000 dosage units. And MASTERS then edited that order from 70,000 to 50,000, which suggests that MASTERS itself thought the order was suspicious. Only less than two weeks later, MASTERS is then filling more orders for oxycodone-30. They say it doesn't show that they thought it was suspicious. They say they're kind of rationing supply. Right, but they haven't actually. That's not contained in the compliance records. And, again, if we look at the May 2010 order and provide a citation, this is at page JA582. This is MASTERS' own notes for that order. Don't say anything about rationing the supply. What they say is that they reduced the order, quote, due to its pattern and size. And it also says that the, quote, pattern and size was always 500 in the middle of the month. So reducing the order there based on some, you know, abstract idea that there was a need to ration the supply is not consistent with the evidence in this case. And, again, we're here on substantial evidence review. I think it's plain from MASTERS' own compliance notes that, in this instance, it's a fair inference to draw that the reason they reduced the order was because they found it unusually large. Their view is, you know, you retroactively change the standard. Of course, they would have put in a lot of information contextualizing and explaining why they refer to pattern and size when they're talking about rationing as opposed to suspicious orders. But what's your view on whether they had a fair opportunity and were on notice what the full range of their duties was? Yeah, I mean, I think in this case it's very clear that MASTERS had ample notices to what their duties were, not just because they had received both the 2006 and 2007 guidance letters, but also because they received an individualized meeting with DEA's investigators at the August 2009 compliance review, a review during which DEA's own investigators specifically highlighted three of the pharmacies at issue here as having ordering trends that were potentially problematic. On top of that, the order to show cause that was issued against MASTERS specifically identifies these seven pharmacies by name and time periods and product types. It says that the focus is on oxycodone. Going even beyond that, then during the administrative hearing itself, prior to the administrative hearing, the government turned over lists of specific orders, again, orders of oxycodone from these seven pharmacies, and testimony of one of its investigators highlighting specific orders, dozens of specific orders, as being suspicious. I don't think there can be any reasonable claim here. Oh, I'm sorry. And the government also then, after the hearing and its proposed findings of facts and conclusions of law submitted to the ALJ, cites these documents listing these orders repeatedly. I don't think there can be any claim that MASTERS was surprised that the administrator relied on this. I think if you really take their due process claim and you boil it down, what it appears to be is a complaint that the administrator was too meticulous here, that this evidence was all in the record, and that he's going through order by order, and that they were somehow caught unawares. These orders are in MASTERS' own compliance records. Again, we just went through some of the compliance notes. Even without going through the notes, the orders' size and patterns and frequency, this is all documented. MASTERS has this information. And again, the government also specifically relied on it repeatedly throughout the hearing. So I don't think there can be any reasonable claim that they were surprised. The violation that the administrator should be focusing on is the failure of reporting? Yes, and in fact, that is what the administrator is focused on here. MASTERS and AMICI have complained about extra, these other additional duties. I think it's difficult to sort of, I mean, I think you need to parse it. Those other things are discussed in the order. They are absolutely discussed in the order, but they are not the basis for liability here. I think it's very clear when you look at the order that the reason they're being discussed in many instances is either because these are duties that MASTERS imposed on itself explicitly in its own psalms program, or because in many instances, so let's take this supposed duty to, you know, not fill certain orders. In those instances where the administrator is discussing it, that's relevant because it indicates that MASTERS, as we discussed earlier, believes some of these orders were suspicious. And therefore should have been reported. And therefore should have been reported, exactly. On the question of the bringing them up because it's a breach of MASTERS' own procedures. So the failure to abide by a company's own procedures itself isn't a violation of a regulation or a statute. No, that's right, and that's not the basis of this decision. The reason it matters here is because MASTERS itself sought to invoke its own compliance program and say that we complied with it as a defense in this instance. It's also, I mean, just to be clear, what the administrator is relying on is not just the fact that MASTERS failed to comply with its own policies, but the fact that it failed in many instances, as I think Judge Pillard noted, to undertake any kind of follow-up whatsoever. Now, that failure is even more egregious in light of the fact that MASTERS, at its 2009 compliance review when it first created this new psalm system, represented to DEA that it was going to abide by these particular practices. That's, I think, plainly relevant here because the regulation, under the regulation the administrator has discretion to deem a given distributor as having substantially complied with the regulation. I think it's important to recognize that in this instance, because MASTERS was failing to undertake any kind of follow-up and particularly failing to undertake the specific, comply with the specific policies that it imposed on itself, that that does go towards the administrator's finding that it violated this regulation. The other reason why the filling information, the orders being filled or not filled, is relevant here to the suspicious order question is because, again, in many instances the filling of the order indicates, is where we get the information that MASTERS edited the order before filling it. And, again, that goes towards an indication that MASTERS itself found these orders suspicious. It's interesting because the way the administrator phrases a lot of the order is to tick off the ways in which MASTERS didn't get a utilization review, didn't do due diligence, didn't comply with the psalms, and then the concluding sentence will be something like, and also failed to report, or moreover failed to report. And when it seems like, and I don't mean to be critiquing presentation, but it seems like the correct analytical framework is, there's a failure to report a suspicious order, and then there were things that could have been done in theory to show that what appeared to be a suspicious order in fact wasn't suspicious, but those things weren't done, which fortifies the notion that it should have been reported. Sure, and I actually read the order as concluding with these orders were suspicious and should have been reported as being based on everything that preceded it. So you think that's the load-bearing phrase is it should have been reported? I think absolutely. And I think also if you look at the headings in the administrator's order itself, that's quite clear. He's saying MASTERS failure to report suspicious orders. He's not saying MASTERS failure to comply with its own policies or MASTERS failure to obtain dispensing reports or utilization reports. The focus at all times, I think, is on the failure to report suspicious orders. I'm happy to address other further questions if this panel has. I just would like to hear your view. Amanda, you've briefed us, but why the standards for and controls necessary to prevent diversion isn't as narrow as MASTERS claims it is. They point to the fact that it doesn't say including and that the administrator shall use the security requirements set forth in .72, .66 as standards for physical security. Did the administrator rely on more than that? And if so, how is that consistent with the regulation? Right. Well, I think in this case, to your last question, the administrator did not rely on more than that because, again, the basis for the decision here was MASTERS reporting failures. And that duty to report suspicious orders is, I think, squarely embedded in 1301.74B, which is one of the regulations referenced in 1301.71. So I don't think the administrator went beyond that at all in this case. And I think, frankly, that the Court's inquiry can end right there. There's an awful lot in the decision suggesting that the failure to maintain effective controls against diversion is what the administrator was focusing on. I mean, you're making it sound pretty straightforward and simple. All I have to do is report, and then they're off the hook. But if that's it, there's an awful lot of additional language in there that seems to be superfluous. It talks about major duties beyond that. Sure. Again, just to take that piece by piece, I think, first, the duty to maintain effective controls against diversion, which comes from the CSA and the statute, is the statutory requirement that these regulations are implementing. So I think there is consistency there that the duty to report, detect, and report suspicious orders is part of that. Yeah, but as the ALJ found, you've got a much harder case to win if that's what you're really focusing on, the failure to maintain controls to avoid diversion. Right. Again, there's nothing the DA has never construed. If I understand Your Honor's question, this is the ALJ's portion of the ALJ's order and her conclusion that DEA would need to produce evidence of likely actual diversion in order to prove violations. That's never been the standard that DEA has followed. And, in fact, it's contrary to the standards and guidelines that DEA set forth in its prior letters and its prior decisions. But, again, even setting that aside, I think, in this case, all of these pharmacies we do know as a practical matter had major problems, and it's not, I think, due to a dearth of evidence that these pharmacies were engaged in diversion, that the evidence wasn't there. It's because that's not the standard, so the government didn't put on that evidence. I think the administrator rightfully corrected that by saying that, again, the standard is, did this particular distributor fulfill its duty to detect and report suspicious orders? And, again, here I think the record is very clear that Masters did not do that. How does a company like – the DEA may know whether pharmacies are suspicious because the DEA has a bunch of information at its disposal, pursuant to investigations and whatnot, that particular pharmacies are engaging in suspicious conduct, but that's not necessarily the case with a company that's distributing substances to those pharmacies, right? I mean, I think that's right, that obviously an individual distributor has much less information than the DEA would writ large. But, again, that's why the requirement doesn't mandate these specific – I mean, the duties that – the due diligence duties that Masters and Meek are identifying about going and looking at every pharmacy's dispensing practices and things like that, there's no – that's not what the regulation is requiring. What they're requiring is that you, if you receive an order that's suspicious, based on its deviation from the normal size, pattern, or frequency from that customer, that you report that. Now – Because then the DEA can make use of the – Exactly. The DEA may have a bunch of other information at its disposal that it can bring to bear on the question, and it can say, well, I've got information – this slice of information from this distributor, a different slice of information from a different distributor. I'm putting it all together. I'm realizing this pharmacy's engaging in suspicious conduct. That's exactly right, and that's why the reporting requirement is so important. I was going to say, is it not the case that the administrator relied on a duty to refrain from shipping in the face of suspicious information? I think, in this case, it's quite clear that the administrator did not rely on that. Again, I think the administrator refers – and I think Judge Edwards alluded to this too – to the fact that, in this case, Masters was filling many of these orders. But the reason that's relevant, again, is because it shows, particularly in instances where it edited the order before filling it, that Masters itself had reason to believe these orders were suspicious. It also shows just the sheer volume in many of these instances of the orders that are being filled that the amount that Masters is filling in these orders in a given month is often exceeding the monthly limit that Masters itself had set as being a basis for determining whether an order itself was suspicious. And so, again, I think Judge Edwards is absolutely right, and you were also absolutely right, that the administrator does discuss the filling or not filling practices, but it's, again, all going towards this question of whether these orders were suspicious and whether Masters had a duty to report them. I can see that my time is up. Did the DEA end up completing the 220-day compliance review that was contemplated by the settlement agreement? I think it was the 180-day review. Yeah, they met two DEA investigators, did, in fact, go to Masters' facility in Ohio and met with them over the course of, I think, two days, at least two days, and went through their, you know, Masters at that point was creating a new SOMS program, and the DEA investigators went through and looked at it and gave Masters feedback. They also, again, it's that review where they identify some of the very pharmacies at issue in this case as having recent problematic ordering trends. So, yes, DEA did perform that review in August of 2009. There are no further questions. Thank you. We'll give you two minutes back for rebuttal, too. Thank you, Your Honor. Let me start by picking up on the last comment that was made. The settlement agreement and the compliance review that took place in August 2009 required the DEA specifically to identify, in writing, any pharmacy that had placed suspicious orders with Masters at any time prior to that, and any pharmacy that did not have a legitimate need for order-controlled substances. That compliance review took place, and the diversion investigator who performed it testified at the hearing, and he testified unequivocally. I did not tell Masters that any customer, including the three that are now the subject of this case, had placed suspicious orders, and I did not tell them that they did not have a legitimate need to order controlled substances. They had a duty, even if he had said something like that, and there's some testimony about he winked at people, something along those lines, even if he had said something at the time, they had a duty to put that information in writing. The administrator takes that evidence, and relying on evidence that occurred prior to the settlement of April 1, 2009, and concludes without any basis whatsoever that Masters was in fact suspicious of each of these pharmacies. That is absolutely contrary to the record. Masters was not suspicious of these pharmacies. Masters had done extensive investigation of each of these pharmacies, including multiple site visits by a former DEA investigator, and concluded that each of them had reasonable justifications for the types of products they were ordering, the types of products they were dispensing. You say that you shouldn't have to show a basis for estoppel to rely on. What should you have to show? You are sort of proffering it as an estoppel-like defense. Their position could be, well, we're in the middle of an investigation. I'm not going to spill the beans on it. There's a place and a time for that. But you say, no, they led us to believe we had a clean bill of health. Isn't estoppel the right way to look at that? Well, Your Honor, if it is, we think we've satisfied it because this is a perfect situation where you have clearly inequitable results. You have the exact same agency coming back two years later and saying, well, we should have told you in 2009 that these were bad pharmacies, but oh well, we forgot. We think it's waiver. We think that's a better argument. But beyond that, Your Honor, beyond the legal arguments, the administrator ignored the facts. And the fact is when you're a distributor and the DEA says we're going to tell you in writing if any of your pharmacies are placing suspicious orders, we're going to tell you in writing if any of your pharmacies don't have a legitimate need for these products, and they don't, it's reasonable for the distributor to assume they do have legitimate needs for these products and they have not placed suspicious orders. So I have to disagree with the argument that this is a case where the administrator found, this was all about just a failure to report. The administrator redefined suspicious order, and he says explicitly, an order of normal size, pattern, and frequency can nonetheless be suspicious by virtue of characteristics of the pharmacy. And what that means is regardless of whether it's a little bit larger or smaller, it varies. A distributor in my client's position and every other distributor in the country has a duty to investigate every single customer without regard to any orders and determine whether that customer is engaged in suspicious conduct because it no longer has anything to do with the size, pattern, and frequency of the order. It has to do with the pharmacy. You've now taken a suspicious order regulation and turned it into a suspicious pharmacy regulation. And that is clearly new. It's clearly substantive. I'm not saying the DEA doesn't have the power at some point to adopt rules along those lines, but they have to do it through notice and comment rulemaking. You can't do it through adjudication. Thank you, counsel. The case is submitted.
judges: Srinivasan, Pillard, Edwards